## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| MICHAEL POTTETTI, Derivatively on Behalf of Nominal Defendant DOCUSIGN, INC., | ) ) ) |
| | ) Case No. _____ |
| Plaintiff, | ) |
| | ) JURY TRIAL DEMANDED |
| v. | ) |
| | ) |
| DANIEL D. SPRINGER, MAGGIE WILDEROTTER, BLAKE J. IRVING, TERESA BRIGGS, ENRIQUE T. SALEM, INHI CHO SUH, JAMES BEER, PETER SOLVIK, and CAIN HAYES, | ) ) ) ) ) |
| | ) |
| Defendants, | ) |
| | ) |
| and | ) |
| | ) |
| DOCUSIGN, INC., | ) |
| | ) |
| Nominal Defendant. | ) |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Michael Pottetti ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant DocuSign, Inc. ("DocuSign" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy Defendants' (defined below) breaches of fiduciary duties and violations of federal law.  Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, conference call transcripts and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, press releases published by and regarding DocuSign, legal filings, news reports,

securities analysts' reports about the Company, and other publicly available information.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought on behalf of DocuSign against certain officers and members of the Company's Board for breach of their fiduciary duties to Company shareholders as set forth below.

2.     DocuSign is a Delaware corporation that offers software to facilitate electronic signatures and agreements. In addition to DocuSign's eSignature services, the DocuSign Agreement Cloud software suite enables users to generate, distribute, and sign agreements, and further offers technological support for, among other things, negotiating agreements and collecting payments after signatures.

3.     As set forth herein, Defendants repeatedly assured investors that DocuSign would continue to experience sustained growth in demand for its software even after COVID-19 pandemic restrictions were lifted.  Defendants' assurances proved to be false.

4.     On December 2, 2021, the Company revealed that billings of $565 million for the third quarter of fiscal 2022 "fell short of [DocuSign's] billings guidance, coming in at 28% year-over-year growth"—or roughly half of the prior quarter's year-over-year growth rate. Additionally, the Company's fourth quarter fiscal 2022 financial guidance missed analysts' expectations.  Specifically, Defendants explained that, "[w]ith the boost from COVID-19 over the past year and a half, we experienced exceptionally high growth rates" but, "[a]s we move through Q3 and into the second half of the year, we saw demand slow and the urgency of customers' buying patterns temper."

5.     On this news, the price of DocuSign common stock plummeted $98.73 per share, or more than 42%, from a close of $233.82 per share on December 2, 2021, to close at $135.09

per share on December 3, 2021.

6.     Defendants made materially false and/or misleading statements, and failed to disclose material adverse facts, about the Company's business and operations. Specifically, Defendants misrepresented and/or failed to disclose: (i) much of DocuSign's accelerated growth in 2020 and early 2021 was attributable to COVID-19 pandemic restrictions rather than a sustainable shift in demand for the Company's services; (ii) demand for DocuSign's services was, in fact, waning as COVID-19 pandemic restrictions were being lifted; and (iii) as a result, Defendants' statements about the Company's business, operations, and prospects lacked a reasonable basis.

7.     Soon after, a securities class action was filed against the Company, captioned *Weston v. DocuSign, Inc.*, Case No. 3:22-cv-00824 (N.D. Cal.) (the "Securities Class Action").

8.     In addition to defending and potentially paying class wide liability in the Securities Class Action, the Individual Defendants' (defined below) conduct has subjected the Company to internal investigations, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly overcompensated by the Company, among other damages.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of sections 10(b) of the Exchange Act and Rule 10b-5 (17 C.F.R.§240.10b-5) promulgated thereunder by the SEC.

10.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

11.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

12.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

13.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) because Nominal Defendant DocuSign is incorporated in this District and conducts business in this District.

## PARTIES

### *Plaintiff*

14.     Plaintiff is, and has been at all relevant times, a shareholder of DocuSign.

### *Nominal Defendant*

15.     Nominal Defendant DocuSign is incorporated under the laws of Delaware with its principal executive offices located in San Francisco, California.  DocuSign's common stock trades on the NASDAQ under the ticker symbol "DOCU."

### *Individual Defendants*

16.     Defendant Daniel D. Springer ("Springer") has served as DocuSign's Chief Executive Officer, President and member of the Board since January 2017. According to the Company's public filings, Springer received $20,701,048 in the fiscal year ended January 31, 2022, and $19,799,168 in the fiscal year ended January 31, 2021 in compensation from the Company.

17.     Defendant Maggie Wilderotter ("Wilderotter") has served as a director of DocuSign since March 2018 and as Board Chair since January 2019. According to the Company's public filings, Wilderotter received $307,639 in the fiscal year ended January 31, 2022, and

$289,091 in the fiscal year ended January 31, 2021 in compensation from the Company.

18.      Defendant Blake J. Irving ("Irving") has served as a director of DocuSign since August 2018. Irving also currently serves as the Chair of the Board' Compensation Committee and as a member of the Nominating Committee. According to the Company's public filings, Irving received $279,566 in the fiscal year ended January 31, 2022, and $247,800 in the fiscal year ended January 31, 2021 in compensation from the Company.

19.      Defendant Teresa Briggs ("Briggs") has served as a director of DocuSign since May 2020. Briggs also currently serves as the Chair of the Board' Audit Committee. According to the Company's public filings, Briggs received $283,212 in the fiscal year ended January 31, 2022, and $433,517 in the fiscal year ended January 31, 2021 in compensation from the Company.

20.      Defendant Enrique T. Salem ("Salem") has served as a director of DocuSign since August 2013. Salem also currently serves as a member of the Board' Audit Committee. According to the Company's public filings, Salem received $272,146 in the fiscal year ended January 31, 2022, and $243,468 in the fiscal year ended January 31, 2021 in compensation from the Company.

21.      Defendant Inhi Cho Suh ("Suh") has served as a director of DocuSign since August 2018. Suh also currently serves as a member of the Board' Compensation Committee and Nominating Committee. According to the Company's public filings, Suh received $270,886 in the fiscal year ended January 31, 2022, and $244,968 in the fiscal year ended January 31, 2021 in compensation from the Company.

22.      Defendant James Beer ("Beer") has served as a director of DocuSign since August 2020. Beer also currently serves as a member of the Board' Audit Committee. According to the Company's public filings, Beer received $272,146 in the fiscal year ended January 31, 2022, and $418,474 in the fiscal year ended January 31, 2021 in compensation from the Company.

23.     Defendant Peter Solvik ("Solvik") has served as a director of DocuSign since 2006. Solvik also currently serves as the Chair of the Board's Nominating Committee and as a member of the Compensation Committee. According to the Company's public filings, Solvik received $277,442 in the fiscal year ended January 31, 2022, and $249,582 in the fiscal year ended January 31, 2021 in compensation from the Company.

24.     Defendant Cain Hayes ("Hayes") has served as a director of DocuSign since December 2020. Hayes also currently serves as a member of the Board' Compensation Committee. According to the Company's public filings, Hayes received $40,628 in the fiscal year ended January 31, 2022, and $406,682 in the fiscal year ended January 31, 2021 in compensation from the Company.

25.     Defendants referenced in paragraphs 16 through 24 are herein referred to as the "Individual Defendants."

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

26.     By reason of their positions as officers and/or directors of DocuSign, and because of their ability to control the business and corporate affairs of DocuSign, the Individual Defendants owed DocuSign and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage DocuSign in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of DocuSign and its shareholders so as to benefit all shareholders equally.

27.     Each director and officer of the Company owes to DocuSign and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

28.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of DocuSign, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

29.     To discharge their duties, the officers and directors of DocuSign were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

30.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of DocuSign, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

31.     As senior executive officer and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ stock exchange, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those

facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

32.     To discharge their duties, the officers and directors of DocuSign were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of DocuSign were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to DocuSign's own Code of Business Conduct & Ethics (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how DocuSign conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of DocuSign and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that DocuSign's operations would comply with all applicable laws and DocuSign's financial statements and regulatory filings filed with the SEC

8

and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

33.     Each of the Individual Defendants further owed to DocuSign and the shareholders the duty of loyalty requiring that each favor DocuSign's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

34.     At all times relevant hereto, the Individual Defendants were the agents of each other and of DocuSign and were at all times acting within the course and scope of such agency.

35.     Because of their advisory, executive, managerial, and directorial positions with DocuSign, each of the Individual Defendants had access to adverse, non-public information about the Company.

36.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by DocuSign.

## DOCUSIGN'S CODE OF BUSINESS CONDUCT AND ETHICS

37.     DocuSign's Code of Conduct explicitly applies to all officers, directors and employees of the Company.  The Code of Conduct "sets forth the fundamental principles and some

9

of the key policies and procedures that govern DocuSign's business."

38.     In a section titled "Financial Integrity," the Code of Conduct states, among other things:

- No employee may take or authorize any action that would cause our financial records or financial disclosure to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC or other applicable laws, rules and regulations;
- All employees must cooperate fully with our finance department, as well as our independent public accountants and counsel, respond to their questions with candor and provide them with complete and accurate information to help ensure that our books and records, as well as our reports filed with the SEC are accurate and complete; and
- No employee should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of our reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of such reports accurate in all material respects.

39.     The Code of Conduct further addresses all officers, directors and employees of the Company with respect to their duty to report potential disclosure issues, stating, "[i]f you become aware that our public disclosures are not full, fair and accurate, or if you become aware of a transaction or development that you believe may require disclosure, you should report the matter immediately to your supervisor or the Compliance Officer."

## DOCUSIGN'S AUDIT COMMITTEE CHARTER

40.     DocuSign's Audit Committee Charter states that the Committee "shall oversee the integrity of the Company's financial reporting process on behalf of the Board. . . ."

41.     With respect to the Audit Committee's responsibilities relating to financial statements and disclosures, the Audit Committee Charter states:

1. **Annual Audit Results.** The Committee shall review with management and the Auditor, the results of the annual audit, including the Auditor's assessment of the quality of the Company's accounting principles and practices, the Auditor's views about qualitative aspects of the Company's significant accounting practices, the reasonableness of significant judgments and estimates (including

material changes in estimates), any "critical audit matters" (as that term is defined in AS 3101 of the Public Company Accounting Oversight Board (the "**PCAOB**")), any significant financial reporting issues identified during the audit, the adequacy of the disclosures in the financial statements, and any other matters that the Auditor must communicate to the Committee under applicable accounting or auditing standards.

2.  **Audited Financial Statement Review.** The Committee shall review, upon completion of the audit, the financial statements proposed to be included in the Company's Annual Report on Form 10-K to be filed with the SEC, and shall recommend whether or not such financial statements should be so included.

3.  **Management's Discussion and Analysis.** The Committee shall review with management and the Auditor the Company's disclosures contained under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations" in its periodic reports to be filed with the SEC.

4.  **Quarterly Results.** The Committee shall review with management and the Auditor, as appropriate, the Company's quarterly financial statements prior to public disclosure of quarterly financial information, if practicable, or filing with the SEC of the Company's Quarterly Report on Form 10-Q, and any other matters required to be communicated to the Committee by the Auditor.

5.  **Earnings Releases and Guidance.** The Committee shall review and discuss with management and the Auditor, as appropriate, earnings press releases as well as the substance of financial information and earnings guidance provided to analysts and rating agencies, which discussions may be general discussions of the type of information (such as financial information that does not conform to generally accepted accounting principles ("**GAAP**")) to be disclosed and the type of presentation to be made.

6.  **Accounting and Securities Principles and Policies.** The Committee shall review with management and the Auditor, as appropriate, significant issues that arise regarding accounting and securities policies and practices, alternative accounting policies available under GAAP related to material items discussed with management, the potential impact on the Company's financial statements of off-balance sheet structures and any other significant reporting issues and judgments, significant regulatory, legal and accounting initiatives or developments that may have a material impact on the Company's financial statements, compliance programs or policies.

7.  **Management and Auditor Analyses.** The Committee shall review any analyses prepared by management or the Auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements.

8. **Proxy Report.** The Committee shall prepare the audit committee report required by the rules of the SEC to be included in the Company's annual proxy statement.

42.     With respect to the Audit Committee's responsibilities relating to internal auditing,

the Audit Committee Charter states, in part:

**Internal Control Over Financial Reporting.** The Committee shall oversee the appointment or replacement of the lead person responsible for the internal audit function, and will discuss with such person (and management and the Auditor, as appropriate) the scope, adequacy and effectiveness of internal control over financial reporting in compliance with Section 404 of the Sarbanes-Oxley Act, including any significant deficiencies and material weaknesses in their design or operation; the internal audit plan, responsibilities, budget, staff and planned scope of work of the internal audit function; and any special audit steps adopted in the event of material control deficiencies. The Committee shall review and discuss with the internal audit function the progress and results of executing the internal audit plan, and shall receive periodic reports on the status of any issues encountered, significant findings and recommendations.

43.     In a section outlining the Audit Committee's responsibilities relating to risk and

compliance, the Audit Committee Charter states, in part:

**Other Legal and Finance Matters.** The Committee shall review with management, legal and regulatory compliance and any actual, pending or threatened legal or financial matters that could significantly affect the Company's business or financial statements or as otherwise deemed appropriate by the Committee. The Committee shall review the Company's compliance with applicable laws and regulations and to review and oversee the Company's policies, procedures and programs designed to promote and monitor legal and regulatory compliance.

## <u>SUBSTANTIVE ALLEGATIONS</u>

### *Background*

44.     DocuSign offers software that facilitates electronic signatures and agreements.

45.     In addition to DocuSign's eSignature services, the DocuSign Agreement Cloud software suite enables users to generate, distribute, and sign agreements, and further offers technological support for, among other things, negotiating agreements and collecting payments after signatures.

**Defendants' False and Misleading Statements**

46.     In a June 4, 2020 press release announcing its quarterly results, DocuSign reported quarterly revenue of $297 million—a 39% year-over-year increase. The press release included comments from Springer who explained that the Company's strong results "reflect our ability to help organizations accelerate their digital transformation as they adapt to the changing business environment, magnified by COVID-19." Defendant Springer further assured investors that "our Agreement Cloud offerings are not only helping customers carry on with business in this time of crisis, but will continue to deliver value as the world emerges from it."

47.     During DocuSign's quarterly earnings call that same day, Defendant Springer observed that "[m]uch of the strong Q1 performance was driven by increased demand for eSignature from organizations that suddenly needed a way to sign and manage agreements from wherever they were" due to pandemic restrictions, and opined "from a financial point of view, we believe this surge in eSignature adoption bodes well for future Agreement Cloud expansion."

48.     During the earnings call, Defendant Springer went on to describe a permanent shift to remote work as a driver of DocuSign's growth:

> Let me speak briefly about where we see things going from here. ***While no one is 100% sure what the world will look like, it's clear that the ways of doing business are changing***. ***Remote work is here to stay***. Core business processes will only become more digital and agreements will need to be completed from anywhere, at any time on almost any device. As a result, for organizations that hadn't already embraced DocuSign for eSignature, that were only using us for a few select use cases, the pandemic has been a catalyst for the greater digital transformation of their end-to-end agreement processes. We always believed this transformation will happen and that a unifying platform for agreements will be needed. COVID-19 is just happening faster.
>
> That said, ***even when the COVID-19 situation is behind us, we don't anticipate customers returning to paper or manual-based processes. Once they take their first digital transformation steps with us and they realize the time, cost and customer experience benefits, they rarely go back. So, in short, we expect the adoption of our core eSignature offering by new customers and the expansion of***

***use cases by existing ones to continue***. This also acts as the on-ramp for the adoption of other Agreement Cloud products, sometimes at the same time, sometimes as follow on's.

\*       \*       \*

Yeah, ***I don't think we've seen anything particularly from COVID that would accelerate that move where we work with one or two divisions and now we get more of an enterprise solution*** other than the same macro piece we talked about, which is, ***as companies are increasingly seeing the need to drive the digital transformation, that's accelerating***. ***It probably, at the same rate, would accelerate those expansions from divisional projects to broader enterprisewide solutions***. But I think, at this point, we'd say, that phenomenon is occurring. It's always been a big growth opportunity for us and I think it's ***the same big growth opportunity for us going forward, but I don't think COVID acceleration of digital transformation is going to change that phenomenon or that rate at which we see that going, other than just making everything go a little bit faster***.[1]

49.     On September 3, 2020, the Company issued a press release announcing its second quarter fiscal 2021 results, reporting enormous growth in the Company's billings, with Defendant Springer stating that "the need to agree electronically and remotely has never been stronger." Defendant Springer also claimed that "[w]e are just scratching the surface of our Agreement Cloud opportunity and believe we are increasingly becoming an essential cloud-software platform for organizations of all sizes."

50.     During the Company's September 3, 2020 earnings call for the second quarter fiscal 2021, Defendant Springer reiterated that consumer demand for the Company's services would be durable:

***This is a great example of COVID-accelerated demand that we see as durable***. Now telehealth will remain after COVID-19, but the paperless processes that came with it will likely end up getting implemented for in-person clinic visits too because the electronic way is more efficient and a better experience than paper and clipboards.

\*       \*       \*

---

[1] Unless other indicated, all emphasis is added.

This illustrates a pattern we're seeing where established customers are no bringing eSignature to new divisions, departments, and regions.

51.     During the same earnings call, Michael Sheridan, the Company's then-Chief

Financial Officer, stated:

And so we are endeavoring to stay ahead of the trends that we're seeing. We're looking at the demand data very carefully to try to forecast the trends and get ahead of that with capacity across the business. In terms of what will we anticipate post-COVID, I don't know that anybody has a great answer for that. It is our view that as we work through these difficult times, though, ***there's a greater awareness of need to digitize the business***. ***And we believe that that's going to be sustained even after things return to whatever normal looks like in the future***. ***So we do believe that we're entering into a period of a "new normal."*** It doesn't necessarily mean that the highs of any particular quarter are going to be sustained forever. But at the same time, ***we don't see trends that things are going to return to the way they looked and trended pre-COVID***.

52.     On that same call, Defendant Springer further represented that the shift to digital

signature and agreement software was natural acceleration of growth rather than an acute response

to pandemic restrictions:

One thing that's always hard in answering a question around sort of more tectonic shifts like that is what's behind it? Is it a maturation of our business? Is it related to COVID, etc.? ***My view is from a COVID standpoint***, was the nature of your question, is ***we went through a period of time where people just got very focused 6 months ago on we just need to get things up and going quickly***. ***We need to work in a remote environment***.

*      *      *

***And I think the number of people that are rushing to us saying, "I need to make a quick adjustment to be able to deal with it like that," if they haven't got it done by now, I think they missed that window***. ***What we are seeing now is people saying, "Wow, this is fantastic***. ***There are more places where I could leverage this in my business."*** And we're looking at expansion, as we talked about, of use cases within our base to more and more places that as I said before, we think they would have gotten there eventually. ***It just accelerated those, and we're continuing to see that acceleration of those workflows into DocuSign because they realize how beneficial they are to their business***. From a standpoint of that more platform thinking, I don't know that I would say I've seen that increase. ***And I don't know if I'd say this increase would be due to COVID***. ***The natural maturation for a lot of folks with us around the Agreement Cloud opportunity is as they start hearing***

15

*us describe the future, they say, "You know what, I could see you as a more strategic part of my sort of IT infrastructure and my business process infrastructure." And so I think that's occurring more and more, but I think that's more to do with the fact that we're just getting bigger and having larger relationships with companies as we scale*. You look at that number of customers above $300,000, it's just sort of, one minute, that keeps growing, right, substantially. And so I think *that's driving it more than a COVID reaction*. But again, it's hard to sort of separate out each of those components, but that would be my view.

53.     On December 3, 2020, DocuSign held an earnings conference call for its third quarter fiscal 2021. During the call, Defendant Springer again projected sustained demand for DocuSign's services that would continue even after pandemic restrictions were lifted, stating:

> As COVID-19 has accelerated the digital transformation of key business and agreement processes, DocuSign has become an increasingly essential cloud software platform. The last few quarters of heightened demand have offered a glimpse into the long-term growth opportunity we have.
>
> *          *          *
>
> When customers go from paper-based processes to digital agreement processes, *they do not go back. We believe that trend will hold when the pandemic subsides, and the DocuSign's value will persist no matter how the future of work unfolds*.

54.     On March 11, 2021, during the Company's quarterly earnings call for the fourth quarter fiscal 2021, Defendant Springer further explained:

> As a team, DocuSign was honored to play a role supporting people all over the world as they responded to the pandemic. We gained new customers, we expanded our relationship with others and we saw a surge in adoption of our products as accelerating a trend already under way, the digital transformation of agreements.
>
> *          *          *
>
> *As a result, we don't believe our new or expanded customers will be going back to paper even after the pandemic recedes*. We also don't believe life will go back to the way it was before. Of course, many in-person activities will be welcomed back. *But when people found better ways during the pandemic, we believe those will continue and flourish, whether it's total or partial work from home, virtual visits to medical professionals or getting a document notarized remotely*.

16

55.     During the same call, on the question of whether demand would decrease as COVID-19 pandemic restrictions were lifted, Defendant Springer represented:

> People aren't going back to paper. They're not going back to manual processing. So the real question, I think, is interesting in your question is, will that rate of new people coming to us change with -- as we start to move into some sort of return to "normalcy". *We haven't seen any change yet*.

56.     During DocuSign's first-ever analyst day on March 24, 2021, Defendants repeatedly refuted the idea that DocuSign was merely a "work-from-home stock" that would only temporarily benefit from unique pandemic circumstances. For example, Cynthia Gaylor ("Gaylor"), the Company's Chief Financial Officer, assured investors that "the permanence of the trends we've been seeing across the business look like they're really here to stay," and that the Company "expect[ed] to continue to see strong growth rates" even as pandemic mitigation efforts changed and ended.

57.     Similarly, in response to a question from Annie Leschin, the Company's Vice President of Investor Relations, about "how investors should think about DocuSign post-pandemic," Defendant Springer explained that "the transformation that our customers are undergoing and leveraging DocuSign to drive . . . is not a short-term thing," and that "we have a significant amount of time ahead of us for this kind of very aggressive growth."

58.     On its June 3, 2021 earnings call announcing financial results for the first quarter of its 2022 fiscal year, Defendant Springer predicted that the trend toward digital signature platforms would "accelerate":

> What began as an urgent need has now transformed into a strategic priority. And as a result, DocuSign has become an indispensable part of many organizations' business processes. Put another way, once businesses digitally transform their agreement processes, they simply don't go back. *We believe this trend will only accelerate as the anywhere economy continues to emerge*.

\*     \*     \*

We're seeing that the phenomenon of that strong customer growth is why you see the net retention rate so high.

\*     \*     \*

So the phenomenon that people, once they see the benefits of the digital transformation, and particularly around the Agreement Cloud from having opportunity to grow their business with us, they don't go back. In fact, they look for additional opportunities to expand. So I don't think -- *we don't talk about the Q1 pull forward like it was some fixed amount to pull forward that pays Peter and takes in Paul*. We look at it as just an increasing demand . . . . We are still in the early days, even of just the eSignature business. Our penetration is so low that it's a very, very large ocean from which we're pulling forward that continued strong customer demand.

\*     \*     \*

And quite frankly, if you think about during COVID, we didn't see the nature of the signature transactions different. They just were faster, right? And so we saw again that acceleration occurred. And as Cynthia pointed out, you know, as we're kind of rounding those quarters, and in many ways, I *think starting to move into whatever the new normal will be, we're still seeing sort of an accelerated rate of that customer demand*. But I wouldn't say it's the size of the transactions are bigger.

59.     During the same call, when analyst Alex Zukin from Wolfe Research stated that DocuSign was not "just the COVID stock," and that the Company is "very well positioned to actually . . . grow right through this and be even better positioned on the other side," Defendant Springer agreed, stating that "I think you nailed it," and that "that's exactly what we're seeing." Defendant Springer emphasized that "[w]e look at it as just an increasing demand."

60.     Similarly, during the Bank of America Securities Global Technology Conference on June 9, 2021, in response to a question from Brad Sills of Bank of America about anticipated demand for DocuSign's services as the economy reopens, Gaylor stated while "we wouldn't expect these accelerated growth rates to last forever . . . because we're so early in that addressable market and there's so much paper, to not use on the planet. We think that this will just continue for a long

18

time to come, and we'll continue to grow at very strong growth rates."

61.     On a September 2, 2021 earnings call for the second quarter of fiscal 2022, Defendant Springer stated, in relevant part:

> We are helping organizations of all sizes leverage the power of the Agreement Cloud to digitize the foundation of doing business, the agreement process. ***Not only do customers see DocuSign as a vital part of their response to COVID***. *Many have also seen a better way of doing business from anywhere*. *And we believe that will become their new normal*.

62.     Responding to a question from Wolfe Research analyst Alex Zukin about changes in the marketplace, Defendant Springer stated that "we feel good. We feel like we're seeing a lot of demand . . . . I do think we're going to continue to have strong growth rates . . . we're not seeing any differences in churn rates in any meaningful way" and "customers very rarely leave us."

63.     Defendant Springer further explained that the Company's guidance for the third quarter of fiscal year 2022, which indicated slightly slower growth than in the previous few quarters, was "[not] indicative of any sort of significant slowing in the business," as "the numbers are strong" and "[w]e're continuing to add a large number of new customers each quarter."

64.     Defendants continued to reassure investors about the sustainability of DocuSign's growth during several analyst conferences in September 2021. First, on September 8, 2021, during Wolfe Research's Inaugural TMT Conference, Gaylor explained that customers "who came to us for a specific COVID use case that they no longer have" are "the vast minority" of users.

65.     Similarly, during Citi's 2020 Global Technology Virtual Conference on September 13, 2021, Defendant Springer highlighted that "we think this is going to be a high-growth software company, [in] e-signature for years and years to come." Likewise, during the Piper Sandler 2021 Virtual Global Technology Conference that same day, Gaylor represented that while the Company did not expect its COVID-era growth rates to persist forever, "there is still a lot of runway" across

"a $50 billion market opportunity."

66.     During the Jefferies Software Conference held the following day, Gaylor emphasized that "we don't expect that level of growth at this scale to continue, but that doesn't mean that we won't have strong growth kind of for the foreseeable future."

67.     The above statements were materially false and misleading, and failed to disclose material adverse facts, about the Company's business and operations. Specifically, Defendants misrepresented and/or failed to disclose that: (i) much of DocuSign's accelerated growth in 2020 and early 2021 was attributable to COVID-19 pandemic restrictions rather than a sustainable shift in demand for the Company's services; (ii) demand for DocuSign's services was, in fact, waning as COVID-19 pandemic restrictions were being lifted; and (iii) as a result, Defendants' statements about the Company's business, operations, and prospects lacked a reasonable basis.

***The Truth Emerges***

68.     The public began to learn the truth about the Company's prospects on December 2, 2021, when DocuSign announced its third quarter fiscal 2022 financial results and provided guidance for the fourth quarter of fiscal 2022. Specifically, DocuSign reported third quarter fiscal 2022 billings of just $565.2 million, short of previous third quarter fiscal 2022 guidance for between $585 million and $597 million. The Company's fourth quarter fiscal 2022 guidance provided, in pertinent part, midpoint revenue guidance of $560 million, missing analysts' consensus estimates of $573.8 million, and billings guidance of $653 million, missing consensus estimates of $705.4 million.

69.     During DocuSign's third quarter fiscal 2022 earnings call that same day, Defendants explained that billings growth for the third quarter of fiscal 2022 was lower than expected, explaining that "we fell short of our billings guidance, coming in at 28% year-over-year

growth."

70.     Defendant Springer explained that the slowdown was occurring because the growth

boost from the COVID-19 pandemic had dissipated earlier than expected:

> The market dynamics that we saw in the third quarter were markedly different from
> what we experienced in the first half of this year. ***With the boost from COVID-19
> over the past year and a half, we experienced exceptionally high growth rates at
> scale as we captured customer demand at an unprecedented pace.*** As we move
> through Q3 and into the second half of the year, ***we saw demand slow and the
> urgency of customers' buying patterns temper. While we had expected an
> eventual step-down from the peak levels of growth achieved during the height of
> the pandemic, the environment shifted more quickly than we anticipated, and
> these were the primary contributors to our billing results in Q3 and our outlook
> for Q4.***
>
> *     *     *
>
> [W]e actually expected to see more of that impact coming out of the kind of the
> COVID extra demand we had experienced. And we didn't, right? And so, we ended
> up outperforming in the first half by probably more than we expected. ***But in the
> second half, we saw this now come in much more dramatically in terms of that
> impact of the removal of that tailwind, if you will***. And I think there's sort of two
> components to it. One, that there is just sort of a change in the buying urgency
> we've seen from customers. And throughout the COVID era, we had a lot of folks
> who really needed to get things in place, particularly if they had a large part of their
> employee base working from home and needed to leverage the benefits of the work-
> from-anywhere solutions that we have at DocuSign.

71.     Defendant Springer further admitted: "we always expected there to be a reduction

of that really heightened COVID buying, which drove our growth rates dramatically higher than

they had ever been even as we got bigger. So we expected that."

72.     Gaylor also explained that the Company had seen "customers shift their buying

patterns in the third quarter" and that Defendants "had expected this to happen more gradually"

but experienced "more notable shift . . . than anticipated[.]"

73.     In response to this news, the price of DocuSign common stock declined $98.73 per

share, or more than 42%, from a close of $233.82 per share on December 2, 2021, to close at

$135.09 per share on December 3, 2021.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

74.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

75.     DocuSign is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

76.     Plaintiff is a current shareholder of DocuSign and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

77.     A pre-suit demand on the Board of DocuSign is futile and, therefore, excused. During the illegal and wrongful course of conduct at the Company and to the present, the Board consisted of Defendants Springer, Wilderotter, Irving, Briggs, Salem, Suh, Beer, Solvik, and Hayes.

78.     Given the factual allegations set forth herein, Plaintiff has not made a demand on the Board to bring this action against the Individual Defendants.  A pre-suit demand on the Board would be futile as there is reason to doubt that a majority of the members of the Board are capable of making an independent and/or disinterested decision to initiate and vigorously pursue this action. As set forth herein, Plaintiff has adequately alleged that there is reason to doubt that the nine current directors of DocuSign are capable of disinterestedly and independently considering a demand to initiate and vigorously prosecute this action.

79.     The Individual Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

80.     Each of the Individual Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

81.     Each of the Individual Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

82.     Additionally, each of the Individual Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

## COUNT I

**Against The Individual Defendants For Violations of § 10(b)**
**of the Exchange Act and Rule 10b-5**

83.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

84.     The Individual Defendants violated § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

85.     The Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately

disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

86.     The Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of DocuSign common stock.

87.     The Individual Defendants acted with scienter because they (a) knew that the public documents and statements issued or disseminated in the name of DocuSign were materially false and misleading; (b) knew that such statements or documents would be issued or disseminated to the investing public; and (c) knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

88.     The Individual Defendants, by virtue of their receipt of information reflecting the true facts of DocuSign, their control over, and/or receipt and/or modification of DocuSign's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning DocuSign, participated in the fraudulent scheme alleged herein.

89.     As a result of the foregoing, the market price of DocuSign common stock was artificially inflated. In ignorance of the falsity of the statements, stockholders relied on the statements described above and/or the integrity of the market price of DocuSign common stock in

purchasing DocuSign common stock at prices that were artificially inflated as a result of these false and misleading statements.

90.     As a result of the wrongful conduct alleged herein, the Company has suffered significant damages, including the costs and expenses incurred in defending itself in the Securities Class Action and reputational harm. In addition, as a consequence of their breach of fiduciary duties, the Individual Defendants have exposed the Company to millions of dollars in potential class-wide damages in the Securities Class Action.

<u>**COUNT II**</u>

**Against The Individual Defendants For Breach Of Fiduciary Duty**

91.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

92.     The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

93.     The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

94.     The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and

deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

95.     As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

96.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

## COUNT III

### Against The Individual Defendants For Aiding and Abetting Breach of Fiduciary Duty

97.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

98.     By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

99.     Plaintiff on behalf of DocuSign has no adequate remedy at law.

## COUNT IV

### Against The Individual Defendants For Unjust Enrichment

100.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

101.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, DocuSign.

102.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from DocuSign that was tied to the performance or artificially inflated valuation of DocuSign, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

103.    Plaintiff, as a shareholder and a representative of DocuSign, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

104.    Plaintiff on behalf of DocuSign has no adequate remedy at law.

## COUNT V

### Against The Individual Defendants For Waste Of Corporate Assets

105.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

106.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue. It resulted in continuous, connected, and ongoing harm to the Company.

27

107.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, inter alia: (a) paying and colleting excessive compensation and bonuses; and (b) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Securities Action.

108.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

109.    Plaintiff on behalf DocuSign has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.    Awarding punitive damages;

D.    Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: May 17, 2022 **RIGRODSKY LAW, P.A.**

By: */s/ Gina M. Serra*
       Seth D. Rigrodsky (#3147)
       Gina M. Serra (#5387)
       Herbert W. Mondros (#3308)
       300 Delaware Avenue, Suite 210
       Wilmington, DE 19801
       Telephone: (302) 295-5310
       Facsimile: (302) 654-7530
       Email: sdr@rl-legal.com
       Email: gms@rl-legal.com
       Email: hwm@rl-legal.com

       *Attorneys for Plaintiff*